**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**John M. STICKNEY, Executor of the Estate of Henry McK. Haserot, and Bonnie C. Haserot, Respondents.**

**No. 17703.**

United States Court of Appeals
Sixth Circuit.

Aug. 30, 1968.

**829**

Gilbert E. Andrews, Dept. of Justice, Washington, D. C., for petitioner; Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Lawrence B. Silver, Attys., Dept. of Justice, Washington, D. C., on brief.

John Lansdale, Jr., Cleveland, Ohio, for respondents; Edward J. Hawkins, Jr., Squire, Sanders & Dempsey, Cleveland, Ohio, on brief.

Before PECK and COMBS, Circuit Judges, and CECIL, Senior Circuit Judge.

JOHN W. PECK, Circuit Judge.

This is the fourth time that this case has been the subject of judicial consideration. The original determination made by the Tax Court in favor of the taxpayer was brought before this court for review by the Commissioner of Internal Revenue. Our order of remand again resulted in a conclusion favorable to the Taxpayer, albeit by a divided Tax Court, and the Commissioner has again petitioned for review here. During the pendency of these proceedings the Taxpayer principally concerned (his wife is a party hereto solely by virtue of their filing of joint returns) died and the executor of his estate has been substituted as a party. However, for simplicity the parties will herein be referred to as "Taxpayer" and "Commissioner."

The issue involves the tax consequences of a cash transfer to Taxpayer and of transfers of stock in three corporations, all of which were before and after the transfers controlled by Taxpayer. The corporations involved are Northport Cherry Factory, Inc., Gypsum Canning Company and Haserot Company. They will herein usually be referred to as "Northport," "Gypsum," and "Haserot" respectively. All have been in existence for many years (Haserot since 1894),

and there is no suggestion of their corporate existence for other than legitimate business purposes.

Northport has been engaged since 1930 in the business of owning and operating cherry orchards and a fruit canning and packing plant at Northport, Michigan. Its products are principally cherries and apple juice, largely canned and marketed under the brand name "Northport," a registered trademark. At all material times it had 4,562 shares of stock outstanding. Gypsum has since 1900 been engaged in the business of owning and operating cherry orchards and the fruit and vegetable packing plant at Port Clinton, Ohio. Its products, principally cherry, tomato and pumpkin food products, have been largely packed under the registered trademarks "Ottawa Chief," "Lakeshore," and "Bellevue." Since its incorporation, Haserot has been engaged in the business of importing, blending, and roasting coffee; importing spices, condiments and other food products; and in wholesaling food products purchased from Northport, Gypsum and others.

With only unimportant exceptions Northport and Gypsum sold their entire output to Haserot, and had no sales or distributing organizations of their own. Haserot furnished the principal management for the other two companies as well as the seasonal financing necessary for their crops and canning operations. Cash advances averaged about $445,000 a year to each company. Haserot's purchases from them during the ten year period subsequent to 1952 varied from $649,745 (1952) to $1,420,860 (1959), and these purchases have constituted about 10% of Haserot's overall food purchases each year. The Tax Court found as a fact that these purchases were important to Haserot "beyond the dollar amounts directly involved" in permitting Haserot to furnish its customers with a greater variety of food products. This opened additional markets to Haserot's salesmen, and by increasing the number of items sold per sales call reduced sales expense per

item. Control of the source of supply of the products involved assured it of continuity in its ability to purchase, removing for instance the problems created in bad crop seasons when independent or competing producers might give other customers preferences. Northport's and Gypsum's brand names were well and favorably known locally, and their regular presence among Haserot's offerings was a benefit to it. Quality control is particularly essential to a less than nationally known brand, and through control of the two other companies Haserot was able to insure the quality of products going into its brand named items.

The advantages of a common control of all three companies were demonstrated in a period 1942–1951, during which Taxpayer was president of Haserot while his father vice-president of Northport and Gypsum. Communication problems and the advanced age of Taxpayer's father (then in his late 80's) resulted in costly, inefficient production practices. In 1951 the elder Haserot gave his stock in Northport and Gypsum to Taxpayer, who thereby obtained control and thereupon assumed the presidency of those companies, as well as of Haserot.

Thereafter a greater efficiency of direct operation was enjoyed, and the directors began discussing and looking with favor upon a transfer of the stock to Haserot. The Tax Court found that their reasons for preferring direct stock ownership by Haserot as against such ownership by Taxpayer were as follows:

"(1) The loss of Northport and Gypsum as suppliers would have been extremely serious.

"(2) Divided control, even within the Haserot family and without loss of Northport and Gypsum as suppliers, had proved inefficient, unpleasant, and costly.

"(3) As long as the Northport and Gypsum stock was held by an individual there was a danger that those shares would become separated from the shares of [Haserot], either by voluntary transfer (which had been responsible for the prior division of control), by involuntary transfer, by inheritance, or by other events after the death of the individual.

"(4) In early 1958, [Taxpayer] was 68 years old.

"(5) In assessing the chances of such an intervivos or testamentary division of the stock all parties involved were deeply influenced by the lack of judgment displayed by [Taxpayer's father] in his late years, and in particular by the latter's actual decision in 1942 to divide control."

Against this background, for the reasons indicated the transaction underlying this law suit was made. Before the transaction, the ownership of the shares in the three corporations was as follows:

"*Northport* (4,562 shares): Taxpayer, 1,999; Gypsum, 1,312; Haserot, 1,-250; Others, 1.

"*Gypsum* (6,582 shares): Taxpayer, 4,486; Haserot, 2,022; Others, 74.

"*Haserot* (33,014 shares): Taxpayer, 18,895; Taypayer's son, 1,023; Estate of taxpayer's father, 10,293; Others, 2,803."

After the transaction, the ownership was as follows:

"*Northport* (4,562 shares): Haserot, 3,249; Gypsum, 1,312; Others, 1.

"*Gypsum* (6,582 shares): Haserot, 6,-508; Others, 74.

"*Haserot* (35,446 shares): Taxpayer, 29,188; Taxpayer's son, 3,455; Others, 2,803."

The increase in Taxpayer's Haserot shares resulted from his acquisition of his father's shares under his will; the increase in Taxpayer's son's Haserot shares resulted from the issuance to him as a gift of shares due Taxpayer.

In the transaction resulting in this shift of ownership of shares, Taxpayer exchanged all of his Gypsum and Northport stock for a money credit (57%) and stock (43%) in Haserot. (After the

transaction he owned 82% of the Haserot stock.). It is from this aspect of the transaction that the central question of this law suit emerges. That question, as will be hereinafter detailed, is whether the monetary consideration received by Taxpayer was subject to capital gain treatment.

In his income tax return (for 1958, the year involved) Taxpayer made no reference to the transaction. After examination and audit, the Commissioner took the position that Taxpayer had received a dividend in the amount of the cash credit he received ($64,850) to be taxed as ordinary income, since it was essentially equivalent to a dividend and Section 304 (a) of the Internal Revenue Code of 1954 (26 U.S.C. 1958 ed. § 304(a)) [1] applied. In the Commissioner's view Sections 301 and 302 required this result. Taxpayer contends that the exchange was covered by Section 351, and urges that the capital gain treatment should be accorded to the extent of the cash portion of the transaction.

Consummation of the transaction occurred February 21, 1958, when Taxpayer transferred his shares in Northport and Gypsum to Haserot. The latter credited Taxpayer's account on its books with the value of the Northport and Gypsum stock and debited his account in the amount of the value of the 2,432 Haserot shares which were issued to Taxpayer's son as a gift from him. Stipulation in the Tax Court established that the proper amount of the credit was $113,490 and that the fair market value of the stock was $48,640. In the deficiency notice issued by Commissioner after examination and audit of Taxpayer's 1958 return his taxable income was increased $113,490, the total of the cash ($64,850) and the fair market value of Haserot stock (determined by Commissioner to be $48,640) Taxpayer received in the transaction. The Tax Court found as a fact that, "In planning the transaction, [Taxpayer] was unaware that it involved either tax problems or tax advantages. He did not consult in advance with counsel or with anyone else as to the income tax consequences of the transaction."

This case has presented difficulties at every stage of the proceedings because the transaction falls within the literal language of both Section 351 and Section 304. Although the value of the 2,432 Haserot shares issued to Taxpayer is now conceded by the Commissioner not to have constituted taxable income, the parties are in disagreement as to how the $64,850 cash payment should be returned. If Section 351 controls, the gain is to be taxed as a capital gain while if Section 304 controls it should be taxed either as a capital gain or the cash payment is to be taxed as a dividend, depending upon the relevant portions of Section 302. Stated in terms of dollars, if Section 304 (a) applies (as Commissioner urges), the $64,850 is dividend income taxable at ordinary rates. If Section 351 applies (as the Tax Court held), no dividend results; rather Taxpayer's gain ($40,584.85— $64,850 (cash) plus $48,650 (value of Haserot shares) minus $72,905.12 (basis of Northport and Gypsum stock)) is taxable as a long-term capital gain.

In its original determination (41 T.C. 562 (1964)), the Tax Court held that the cash credit was capital gain, and upon review this court remanded the case for a determination by the Tax Court as to whether the transaction was "essentially equivalent to a dividend" within the meaning of Sections 302(b) (1) and 301 (a) (Commissioner of Internal Revenue v. Haserot, 355 F.2d 200 (1965)). Pursuant to the remand, the Tax Court found that, "The $64,850 cash credit received by petitioner in 1958 constituted a distribution essentially equivalent to a dividend." In arguing to the contrary, Taxpayer asserts that (1) the transaction produced a substantial change of control at the shareholder level, and that (2) the transaction was motivated by and achieved a corporate business purpose.

With reference to Taxpayer's first point, it is true that if only the shares

---

1. All statutory references hereinafter are to the Internal Revenue Code of 1954.

registered in his own name are taken into account his percentage of control is as follows:

|  | Northport | Gypsum | Haserot |
|---|---|---|---|
| Before | 43.8% | 68.2% | 57.2% |
| After | 0% | 0% | 82.3% |

This is not, however, an accurate reflection of Taxpayer's control because of his ownership of the majority interest in Haserot, which in turn held stock in Northport and Gypsum. The following table indicates the effective control enjoyed by Taxpayer over all three corporations, both before and after the transaction: [2]

|  | Northport | Gypsum | Haserot |
|---|---|---|---|
| Before | 99.9% | 98.9% | 57.2% |
| After | 99.9% | 98.9% | 82.3% |

After a review of the facts and a discussion of Taxpayer's arguments, the Tax Court concluded, "We hold that under all the circumstances of this case there has not been that 'meaningful change' in [Taxpayer's] shareholder position which is the 'indispensible first step' to a finding of lack of dividend equivalent. Bradbury v. Commissioner [of Internal Revenue], 298 F.2d 111 (1st Cir. 1962) * * *; Leon R. Meyer, 46 T.C. 65 (1966), on appeal (8th Cir. June 15, 1966); Ralph L. Humphrey, 39 T.C. 199 (1962)."

With reference to Taxpayer's second point, Taxpayer argues that a corporate business purpose existed sufficient to constitute a " * * * conspicuously countervailing considerations to dispel the aura of dividend equivalence * * *." See Bradbury v. Commissioner of Internal Revenue, supra, 298 F.2d at 117. However, such a purpose does not per se establish nonequivalences. See Neff v. United States, 305 F.2d 455, 457, 157 Ct. Cl. 322 (1962); Charles Swan, 42 T.C. 291, 299 (1964), aff'd 355 F.2d 795 (6th Cir. 1966). It is Taxpayer's contention that the transaction assured Haserot control over Northport and Gypsum and preservation of Haserot stock ownership. The argument contends that Taxpayer might have become a "chip off the old block" and might then have repeated the mistakes made by his father. This argument falls of its own weight when it is remembered that the operating difficulties allegedly created by Taxpayer's father in his advancing years occurred during the period when there was a lack of common control over the three corporations. Thereafter, the Tax Court found that Taxpayer's common ownership of all three corporations assured a unity of success or failure of their operations.

Taxpayer argued further, in connection with his second point, that a business purpose existed in the alleged goal of preserving ownership of Haserot in active management. We agree with the Tax Court that this argument fails to take into account the cardinal fact that management of a corporation is in the final analysis at the mercy of the shareholders. Following the transaction Taxpayer remained free to transfer, either *inter vivos* or at death, to persons within the circle —or to strangers to it. In the circumstances the Tax Court properly concluded "that acquisition by [Haserot] of the Northport and Gypsum shares and 'assisting' petitioner to acquire the [Haserot] shares owned by the estate of [Taxpayer's] father constituted a sufficient 'conspicuous countervailing considera-

2. Because of the manner of Taxpayer's acquisition of Haserot stock under his father's will, there was a dispute in the Tax Court as to the application of the attribution rules under Section 318. Such application would have increased his percentage control of Haserot (both before and after the transaction), and slightly decreased his percentage control of Gypsum and Northport, but a discussion of such application is omitted herefrom as immaterial to the conclusion. For different but obvious reasons discussion is also omitted of the argument that the transaction was really a step in Taxpayer's plan to ultimately transfer control to his son.

tion.' See Bradbury v. Commissioner [of Internal Revenue], supra, at 117."

Based on its rejection of Taxpayer's arguments, and after a full discussion of them, as hereinabove indicated the Tax Court responded to our mandate by concluding that the cash credit distributed to Taxpayer constituted a distribution essentially equivalent to a dividend. That holding is not clearly erroneous and is here affirmed.

The significance of this determination lies in the fact that had a finding of a lack of dividend equivalency been made Section 302(a) would have had application, and under the direction of that section the sum would be subject to treatment "as a distribution in part or full payment in exchange for stock." Equivalency having been found, and Section 302(a) having been thereby excluded from consideration, we return to the question as to whether tax liability should be determined under Section 304(a)(1) or under Section 351. The treatment provided under 304(a) is appropriate where "one or more persons are in control of each of two corporations," while Section 351 treatment (by virtue of the definition contained in Section 368(c)) only becomes available where a holding of 80% of the combined voting power of stock is held. Had Taxpayer's holdings amounted to only 50% to 80% the Section 304(a) treatment would have been exclusively available, and the question therefore is whether in this instance of an exchange as distinguished from a sale the fact that when his holding passed the 80% mark the tax treatment to be accorded passed exclusively to that provided by Section 351.

In its opinion on the remand, the Tax Court specifically limited itself to a consideration of the dividend equivalency

question and reached no conclusion as to whether Section 351 operates so as to preclude the application of Section 304(a). However, there is appended to the Tax Court opinion a document in which Judge Tannenwald (the author of the opinion) "speaking separately" expressed his views on the latter question. That separate opinion (in which one other judge joined) first expressed the view, not shared by a majority of his colleagues, that the Tax Court had the power to reconsider the question of the applicability of Sections 351 or 304(a). Thereafter, Judge Tannenwald reaches the conclusion that Section 304(a) rather than 351, controls.[3] We disagree, and instead affirm the reaffirmance by a majority of the Tax Court of its original decision.

Taxpayer urges that the case fits within the provisions of Section 351, and the Commissioner's brief in this court opens with a statement of the question involved, which contains the statement that the transaction "fits within the literal terms of Section 351." That section in pertinent part provides as follows:

"SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

"(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

"(b) RECEIPT OF PROPERTY.— If subsection (a) would apply to an exchange but for the fact that there is

3. Taxpayer's brief points out that the question of dividend equivalences was the only point briefed to the Tax Court on remand by either side, and that no oral argument was held "because a request for it was denied." The observation is further therein offered that Judge Tannenwald had not been a member of the court at the time of the original trial of the case, and that by his "separate opinion" he in effect dissented from the original decision of the Tax Court. The original opinion had been written by Judge Train, who was no longer a member of the Court at the time of the second submission.

received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then—

  (1) gain (if any) to such recipient shall be recognized, but not in excess of—

  (A) the amount of money received, plus

  (B) the fair market value of such other property received; and

  (2) no loss to such recipient shall be recognized."

In view of the agreement of the parties as to the application of this section to the factual pattern of this case it would serve no useful purpose to further labor the point, particularly since a comparison of the foregoing quotation from Section 351 and the facts clearly demonstrates the applicability. In marked contrast, if Section 304(a) also applies, that can only be determined by laboring through a labyrinth of related sections. Section 304 is not self-executing in any sense, and where it has application the tax liability can only be determined by reading other sections in *pari materia*. One of the sections which must be so read, and to which specific reference is made in 304, is Section 301. That section is the initial section of the chapter which contains all of the sections quoted in this opinion, and it begins with the words, "Except as otherwise provided in this Chapter * * *." To hold that the tortured construction of Section 304(a) urged by the Commissioner causes it to fit the situation in issue is difficult, and to conclude that it is controlling is to entirely ignore the existence of the opening language of the chapter, "Except as otherwise provided in this Chapter." The only reasonable explanation for the presence of those words (we are unable to agree with the tenuous explanation offered by Commissioner) is that when another section of the chapter has application the Section 301 treatment is to be excluded; as previously indicated, this includes the Section 304(a) formula. We decline to follow the devious approach urged by the Commissioner, and conclude that Section 351 applies.

In reaching this conclusion we are not unmindful of the argument advanced by the Commissioner concerning legislative intent. As a background for this argument, he presents the illustration of a stockholder controlling two or more corporations who arranges to have one corporation purchase the stock of another for cash in order to bail out (at the cost of no more than a capital gains tax) corporate earnings which would otherwise be taxed as dividends at ordinary rates. Against this background the Commissioner urges that Congress could not have intended such bailing out practices to be denied shareholders owning control in the 50–79% bracket while they remained available to the stockholder whose control exceeded 80%. While this is concededly an oversimplification of his argument, the fact remains that the applicable section is not to be determined solely on the basis of the extent of control. The application of Section 304 is limited to sales and to sales alone. Section 351 contains no such limitation, and by its express provisions extends its application to exchanges, with which we are engaged in the present situation.

Particularly able arguments were heard in this case, and counsel stopped just short of agreeing that Commissioner was contending his construction of statutes to be correct because that was what Congress should have said. If our logic seems to support that contention it is sufficient to respond that Congress did not say it, but did utter the clearly applicable language enacted as Section 351. Had Congress intended the Section 304(a) treatment to apply to such situations as the present one that end could have been accomplished by a specific affirmative enactment, or by a negation of 351 application.

In the original opinion of the Tax Court, Judge Train stated:

  "We have no reason to believe that Congress had any intent with regard to the fact pattern in this case. However,

the statements in sections 301(a) and 302(d), 'except as otherwise provided in this chapter' [or subchapter] of the Code, indicate that Congress made the policy decision that dividend treatment will result from the application of Section 302 only if no other provision in the relevant parts of the Code requires other treatment. Section 351 has no such limitation. That section is, by its terms, applicable. That section provides for tax treatment of the payment in question in a manner other than and different from the distribution treatment provided for by sections 302(d) and 301. Consequently, the very words in the latter sections preclude dividend treatment in this case."

We are in accord with this determination, and accordingly affirm the decision of the Tax Court.