ROHINTON K. BHADA AND PATRICIA A. BHADA, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

EDWARD J. CAAMANO AND JANICE W. CAAMANO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 22588-86, 22589-86. Filed November 5, 1987.

*John P. Carroll, Jr., Richard M. Fabbro,* and *Leslie J. Hoffman,* for the petitioners.
*Alfred C. Bishop, Jr.,* for the respondent.

OPINION

NIMS, *Judge:* This matter is before the Court on the parties' cross-motions for partial summary judgment pursuant to Rule 121.[1] The parties have complied with the requirements of Rule 121, and we find that a partial summary judgment is appropriate in this case. The issue raised by each motion is whether the shares of International common stock received by petitioners in exchange for McDermott common stock constitute "property" within the meaning of section 304(a)(2)(A).

All the facts have been agreed upon (stipulated) for purposes of these Rule 121 motions.

Petitioners Rohinton and Patricia Bhada were residents of Alliance, Ohio, and petitioners Edward and Janice Caamano were residents of New Orleans, Louisiana, when the petitions in these cases were filed. There are approximately 87 docketed cases in this Court involving the same transaction, and these two cases have been identified as test cases for the purpose of resolving the preliminary issue concerning the applicability of section 304 to the transaction in question.

---

[1] All Rule references are to the Tax Court Rules of Practice and Procedure. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect during the years in issue.

McDermott, Inc. (McDermott), was a Delaware corporation at all relevant times. From 1959 until December 10, 1982, McDermott was the parent corporation to a group of corporations hereinafter referred to as the McDermott Group. From 1959 until December 10, 1982, McDermott International, Inc. (International), was a wholly owned subsidiary of McDermott and a controlled foreign corporation within the meaning of section 957.

Pursuant to a plan of reorganization adopted on October 28, 1982, by the boards of directors of McDermott and International, International made an offer to exchange cash and shares of its own stock (International common) for shares of the common stock of McDermott (McDermott common). International distributed a prospectus dated November 24, 1982 (the prospectus), which stated the terms and conditions on which the offer was made.

The prospectus stated:

> The principal purpose of the reorganization is to enable the McDermott Group to retain, reinvest and redeploy earnings from operations outside the United States without subjecting such earnings to United States income tax. This will enable the McDermott Group to compete more effectively with foreign companies by taking advantage of additional opportunities for expansion which require long-term commitments, the redeployment of assets and the reinvestment of earnings. The reorganization will also result in direct shareholder participation in the accumulated and future profits of International earned abroad rather than shareholder participation in such foreign earnings only after they are first distributed to the Delaware Company and subjected to corporate income tax at a rate substantially higher than the average rate prevailing in the areas in which International operates. Finally, the reorganization will permit International to invest its accumulated foreign earnings in the United States without Federal income tax being imposed on the Delaware Company upon the making of such investment.

> *   *   *   *   *   *   *

> The aggregate amount reported by [McDermott] as Subpart F income of International in the five years ended March 31, 1982 was approximately $20,000,000 and the aggregate United States income tax imposed thereon was approximately $9,000,000. * * * If, however, the business of International continues in its present form and at levels now anticipated by management for the five succeeding years, it is anticipated that the aggregate Subpart F income generated by International will be approximately $585,000,000 for such years and the aggregate United States income tax imposed on that total amount would (at currently prevailing rates) be approximately $220,000,000. In the opinion of Davis Polk &

Wardwell, United States Counsel to International, the reorganization, under present laws and regulations, will enable the McDermott Group to avoid future Subpart F income tax costs because, after the exchanges pursuant to the offer, International will no longer be a CFC [controlled foreign corporation].

Under the terms of the offer, International was to exchange 1 share of International common plus $0.35 for each outstanding share of McDermott common. The offer was conditioned upon the tendering of a minimum of 22 million shares of McDermott common. International also retained the right to refuse to accept more than 30 million shares of McDermott common.

On December 10, 1982, International accepted, pursuant to the terms of the offer, all shares of McDermott common tendered by each shareholder holding 99 or fewer of such shares and accepted a portion of all the shares of McDermott common tendered by each shareholder holding 100 or more of such shares, as was determined on the terms concerning proration stated in the Prospectus. International acquired 30 million shares of McDermott common for which it gave $10,500,000 and 30 million shares of International common. As a result of the exchange, International held approximately 68 percent of the voting power in McDermott, and former holders of McDermott common who participated in the exchange held approximately 90 percent of the voting power in International.

Petitioners participated in the December 1982 transactions. In response to the offer, petitioners Rohinton and Patricia Bhada tendered to International 26 shares of McDermott common and received in return 26 shares of International common and $9.10 in cash. Petitioners Edward and Janice Caamano tendered to International 50 shares of McDermott common and received in return 50 shares of International common and $17.50 in cash. On December 10, 1982, the fair market value of one share of International common was $19.

Section 304(a)(2) provides:

(2) ACQUISITION BY SUBSIDIARY.—For purposes of sections 302 and 303, if—

(A) in return for property, one corporation acquires from a shareholder of another corporation stock in such other corporation, and

(B) the issuing corporation controls the acquiring corporation,

then such property shall be treated as a distribution in redemption of the stock of the issuing corporation.

Section 304(c) provides, in part, that control, for purposes of section 304, means ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote, or at least 50 percent of the total value of shares of all classes of stock.

If section 304(a)(2) applies to the December 1982 transaction, the International common and cash received by petitioners must be treated as a distribution in redemption of their stock in McDermott, and it will be necessary to apply section 302 to determine the character of the amounts received by petitioners in International common and cash. The parties have agreed that the cash received by petitioners is property for purposes of section 304(a)(2) and that if section 304 does not apply to the International common received by petitioners, the tax consequences of the receipt of that stock will then be governed by section 1001.[2]

Section 304 does not apply to the International common received by petitioners unless this stock was "property" for purposes of section 304(a)(2).[3] The term "property" is

---

[2]Sec. 351 does not apply in this case because of the failure to meet the 80-percent control requirement of sec. 351. Although the former McDermott shareholders owned 90 percent of the total voting power in International after the December 1982 exchange, they did not own at least 80 percent of the total of all other classes of stock of International. McDermott, at all relevant times, owned all of the shares of a class of nonvoting preferred stock of International. Respondent speculates that if sec. 304 does not apply to the December 1982 transaction, the former shareholders of McDermott will suffer no adverse tax consequences and will in many cases recognize a loss for tax purposes.

[3]The issue in this case, whether the stock of a subsidiary corporation received in a transaction described by sec. 304(a)(2) constitutes property, is before this Court for the first time. In the context of a brother-sister transaction described in sec. 304(a)(1), however, one member of this Court has indicated in a "speaking separately" opinion that in his view the stock of the acquiring corporation is not property. See *Haserot v. Commissioner*, 46 T.C. 864, 874 (1966), affd. sub nom. *Commissioner v. Stickney*, 399 F.2d 828 (6th Cir. 1968) (Tannenwald, J., speaking separately) (the purpose of sec. 317(a) was to avoid treating as a distribution under secs. 301(a) and 302(d) the value of stock distributed by the acquiring corporation). Respondent has concurred in the opinion that, in brother-sister transactions described in sec. 304(a)(1), the stock of the acquiring corporation is not property. See, e.g., sec. 5.08, Rev. Proc. 83-22, 1983-1 C.B. 680, 686; sec. 5.04, Rev. Proc. 82-22, 1982-1 C.B. 469, 473; sec. 2, Rev. Proc. 81-61, 1981-2 C.B. 683. ("Property, [for purposes of secs. 304 and 351], is defined in sec. 317(a) and, in general, * * * excludes stock of the transferee.") (Respondent insists that these Revenue Procedures refer only to transactions described in section 304(a)(1) even though the Revenue Procedures themselves draw no distinction between sections 304(a)(1) and 304(a)(2).) See also Rev. Rul. 73-2, 1973-1 C.B. 171; Rev. Rul. 78-422, 1978-2 C.B. 129.

The commentators are split on this issue. Bittker and Eustice conclude that the stock of the subsidiary received in a sec. 304(a)(2) transaction is not property. B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.32, at 9-53—9-54 (4th ed.

defined in section 317(a), which provides:

For purposes of this part, the term "property" means money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock).

The receipt of stock of a corporation which is not stock of the distributing corporation is "property." See H. Rept. 1337, 83d Cong., 2d Sess. A 100 (1954).

Respondent argues that the true nature of the transaction between International and petitioners was an exchange of International common for McDermott common rather than a distribution by International of its stock in exchange for McDermott common. It is respondent's position that the term "distribution" in section 317(a) refers only to a distribution by a corporation with respect to its stock to its shareholders in their capacity as shareholders. Because International gave its stock to McDermott's shareholders and not to its own shareholders, respondent maintains that there was no distribution as defined in section 317(a). We disagree.

The terms "property" and "distribution" are defined in section 317 for purposes of part I of subchapter C of the Internal Revenue Code. Section 317(a); *Anderson v. Commissioner*, 67 T.C. 522, 561 (1976), affd. per curiam 583 F.2d 953 (7th Cir. 1978). Respondent finds support for his definition of the term "distribution" by asserting that the term "distribution" as it appears in every section in part I of subchapter C refers to a distribution by a corporation to its shareholders in relation to its stock. However, in section 304, itself, Congress has used the term "distribution" in its generic sense. Section 304(b)(3)(A), provides, "Except as otherwise provided in this paragraph, subsection (a) (and not section 351 and not so much of sections 357 and 358 as relates to section 351) shall apply to any property received in a distribution described in subsection (a)."

---

1979). Frost and Burns agree. F. Frost & D. Burns, "Current Tax Problems While Operating as a Corporation," 1958 S. Cal. Tax Inst. 117, 158 (1958).

Tiger, on two different occasions, has argued (1) that the stock of a subsidiary received in a sec. 304(a)(2) transaction is property; and (2) that it is not property. Tiger, "Sales of Stock to Related Corporations: Current Problems Under Section 304," 40 J. Tax 86, 87 (1974) (stock of the acquiring corporation is not property); Tiger, "Redemption Through the Use of Related Corporations: New and Old Problems Under Section 304," 39 Tax L. Rev. 79 (1984) (stock of a subsidiary issued by the subsidiary to shareholders of the parent in exchange for the parent's stock is property).

At first glance, it is difficult to determine whether the term distribution in section 304(b)(3)(A) refers to the distribution of property by the acquiring corporation to shareholders of the parent corporation that triggers the application of section 304 or to the hypothetical redemption distribution by the parent to its own shareholders that follows when section 304(a)(2) applies. This ambiguity is resolved, however, by section 304(b)(3)(B), which provides in pertinent part:

(B) CERTAIN ASSUMPTIONS OF LIABILITY, ETC.—
    (i) IN GENERAL.—In the case of an·acquisition described in section 351, subsection (a) shall not apply to any liability—
    (I) assumed by the acquiring corporation, or
    (II) to which the stock is subject,
if such liability was incurred by the transferor to acquire the stock. For purposes of the preceding sentence, the term "stock" means stock referred to in paragraph (1)(B) or (2)(A) of subsection (a).

Section 304(b)(3)(B) provides that in a transaction described in both sections 304(a) and 351, section 304(a) does not apply to certain liabilities assumed by the acquiring corporation or to which the stock is subject. The reference to the assumption of liabilities by the acquiring corporation indicates that section 304(b)(3)(B) refers to the actual transaction, i.e., the distribution of property by the acquiring corporation to shareholders of another corporation rather than the hypothetical redemption under section 304(a). Because section 304(b)(3)(B) refers to the actual transaction that triggers section 304, we can only conclude that section 304(b)(3)(A) also refers to the actual transactions when it uses the term distribution. Accordingly, the term distribution in section 317(a) does not exclusively refer to a distribution by a corporation to its shareholders with respect to its stock.

From this it follows that International "distributed" its own stock to petitioners in the December 1982 exchange, and that such stock is not to be deemed property. This is because the International common was the stock of the corporation making the distribution, it was not property, and section 304 does not apply.[4]

---

[4] Because we hold for petitioners in this case, we need not address their other arguments.

Respondent contends, however, that section 304(b)(3)(B) refers to actual transactions but that section 304(b)(3)(A) refers to the hypothetical redemption that occurs when section 304 applies. Respondent reasons that section 304(b)(3)(B) concerns liabilities assumed (a much more difficult matter to express in terms of the hypothetical transaction), whereas the conflict between sections 304 and 351 does not arise until after the hypothetical redemption distribution comes into play. We decline to adopt respondent's reading of the statute. Neither section 304(b)(3)(B) nor section 304(b)(3)(A) applies unless there is a conflict between sections 304 and 351. Respondent's analysis assumes that there is no relationship between sections 304(b)(3)(B) and 304(b)(3)(A). The language of the statute does not support respondent's position nor does anything in the legislative history suggest such a contorted reading of the statute.

Paragraph (3) was added to section 304(b) by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, section 226(a)(1)(A), 96 Stat. 324,[5] to resolve the problems raised by transactions that literally fall within the provisions of both sections' 304 and 351. See H. Rept. 97-760 (Conf.) (1982), to accompany H.R. 4961 (Pub. L. 97248), 1982-2 C.B. 600, 635.

Section 351[6] provides that no gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in that corporation and immediately after the exchange the persons who transferred the property are in control of the corporation. For the purposes of section 351, "control"

---

[5]Sec. 712(1) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 953, amended secs. 304(b)(3)(A) and 304(b)(3)(B). The amendments do not affect the result in this case.

[6]Sec. 351 provides in pertinent part:

SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

(b) RECEIPT OF PROPERTY.—If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then—

(1) gain (if any) to such recipient shall be recognized, but not in excess of—

(A) the amount of money received, plus

(B) the fair market value of such other property received; and

(2) no loss to such recipient shall be recognized.

means ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation. (Section 351(a) cross-refers to section 368(c) for the definition of "control" applicable to section 351(a).) If property is received in addition to stock by persons transferring property to the corporation in a transaction to which section 351 applies, gain must be recognized but only to the extent of the amount of money received plus the fair market value of any other property received. Sec. 351(b). In other words, the property received in a section 351 transaction is treated as a sale or exchange rather than a dividend and may qualify for capital gain or loss treatment.

Before section 304(b)(3) was enacted, it was possible for taxpayers to avoid the application of section 304 to property received in addition to stock in an exchange of stock for stock of a related corporation if they met the 80-percent control requirement of section 351. See, e.g., *Haserot v. Commissioner,* 41 T.C. 562 (1964), remanded 355 F.2d 200 (6th Cir. 1965), 46 T.C. 864 (1966), affd. sub nom. *Commissioner v. Stickney,* 399, F.2d 828 (6th Cir. 1968).

To prevent such a circumvention of section 304, Congress enacted section 304(b)(3). The Conference report explains:

> The conference agreement extends the anti-bailout rules of sections 304 and 306 of present law to the use of corporations, including holding companies, formed or availed of to avoid such rules. Such rules are made applicable to a transaction that, under present law, otherwise qualifies as a tax-free incorporation under section 351.
>
> Section 351 generally will not apply to transactions described in section 304. Thus, section 351, if otherwise applicable, will generally apply only to the extent such transaction consists of an exchange of stock for stock in the acquiring corporation. [7] * * *
>
> [H. Rept. 97-760 (Conf.) (1982), to accompany H.R. 4961 (Pub. L. 97248), 1982-2 C.B. 600, 635.]

Thus, it appears from the Conference report that Congress was concerned only with the treatment of property

---

[7]Respondent has also concluded that in a transaction involving the overlap of secs. 304 and 351, sec. 351 will apply only to the extent that the transaction consists of an exchange of stock for stock in the acquiring corporation. See, e.g., Rev. Rul. 73-2, 1973-1 C.B. 171; Rev. Rul. 78-422, 1978-2 C.B. 129. Respondent maintains, however, that these Revenue Rulings are applicable only to transactions involving brother-sister corporations described in sec. 304(a)(1) and do not apply to parent-subsidiary transactions described in sec. 304(a)(2).

received in a transaction that fell under the provisions of both sections 304 and 351. Congress must have assumed that section 304 would not apply to the stock of the acquiring corporation received by the shareholders of the related corporation because the stock of the acquiring corporation in a section 304(a) transaction is not property.

Respondent maintains that section 304(b)(3) was directed only at brother-sister transactions described in section 304(a)(1) rather than parent-subsidiary transactions described in section 304(a)(2). Therefore, respondent explains, the stock of a sister corporation received in a 304(a)(1) transaction is not property for purposes of section 304, but the stock of the acquiring subsidiary corporation in a section 304(a)(2) transaction is property. We disagree. Section 304(b)(3) specifically mentions that it applies to both sections 304(a)(1) (brother-sister transactions) and 304(a)(2) (parent-subsidiary transactions). Sec. 304(b)(3)(B)(i).

The legislative history of section 304 supports our conclusion. The predecessor of section 304(a)(2) was enacted in 1950 as section 115(g)(2) of the Internal Revenue Code of 1939 (hereinafter referred to as section 115(g)(2)), which provided:

(2) REDEMPTION THROUGH USE OF SUBSIDIARY CORPORATION.—If stock of a corporation (hereinafter referred to as the issuing corporation) is acquired by another corporation (hereinafter referred to as the acquiring corporation) and the issuing corporation controls (directly or indirectly) the acquiring corporation, the amount paid for the acquisition of the stock shall constitute a taxable dividend from the issuing corporation to the extent that the amount paid for such stock would have been considered, under paragraph (1), as essentially equivalent to a taxable dividend if such amount had been distributed by the acquiring corporation to the issuing corporation and had been applied by the issuing corporation in redemption of its stock. For the purposes of this paragraph, control means the ownership of stock possessing at least 50 per centum of the total combined voting power of all classes of stock entitled to vote or at least 50 per centum of the total value of shares of all classes of stock of the corporation.

In enacting section 304(a)(2), Congress intended to incorporate the substance of section 115(g)(2). H. Rept. 1337, 83d Cong., 2d Sess. A79 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 239 (1954). Both section 115(g)(2) and section 304(a)(2), when they apply, treat the acquisition of the stock of its

parent by a subsidiary corporation as though the parent corporation had redeemed its own stock.[8] If the transfer of International common is to be treated as a distribution by McDermott in redemption of its stock, then the International common is property as defined in section 317(a) because it is not the stock of the corporation making the distribution.

Had Congress reenacted the actual language of 115(g)(2), it is arguable that the International common received by petitioners would have to be tested for dividend equivalency under the provisions of section 115(g)(2). The transaction that would have triggered the application of 115(g)(2) is the acquisition of its parent's stock by a subsidiary, apparently regardless of the type of consideration received, as in this case.[9] Thus, under section 115(g)(2) the International common might have been treated as if it had been received by McDermott's shareholders in redemption of McDermott's stock. Under this analysis, because the International common is not the stock of the deemed distributing corporation (McDermott) under section 115(g)(2), it would have been property.

Congress, however, did not adopt the language of section 115(g)(2) when it enacted section 304(a)(2). Instead, Congress wrote the current statute to require the receipt of property by the shareholders of the parent corporation before section 304 will apply. Accordingly, we must first determine whether the International common distributed by International was property before we can determine whether section 304 applies. Because, as we have above held and for the reasons stated, the distribution by a corporation of its own stock is not property, section 304 does not apply (except as to the cash paid to the McDermott shareholders).

Our conclusion comports with the purpose of section 304(a)(2). Section 115(g)(2) of the Internal Revenue Code of 1939, from which section 304 is derived, was enacted in response to the decision in *Rodman Wanamaker Trust v.*

---

[8] Both sec. 115(g)(2) and sec. 304(a)(2) would apply, for example, if a subsidiary were to acquire its parent's stock for cash.

[9] Sec. 115(g)(2) applies in terms of "the amount paid" for the parent's stock. Presumably the form of payment could have included the subsidiary's stock, although the legislative history makes it clear that Congress was targeting the stock-for-cash type of transaction exemplified by *Rodman Wanamaker Trust v. Commissioner*, 11 T.C. 365 (1948), affd. 178 F.2d 10 (3d Cir. 1949), when it enacted sec. 115(g)(2). See discussion in text, *infra.*

*Commissioner*, 11 T.C. 365 (1948), affd. 178 F.2d 10 (3d Cir. 1949), in which the Court treated the cash received by the taxpayer from a subsidiary in return for shares of its parent's stock as proceeds of a sale rather than a dividend.

The committee reports reveal Congress' intent to prevent sale or exchange treatment in cases in which assets of a subsidiary are withdrawn from corporate solution in exchange for stock of its parent.

[In *Wanamaker*, section 115(g) of the Internal Revenue Code of 1939] was held not to be applicable when a subsidiary corporation purchased the stock of its parent * * * , even though the effect was, in fact, identical with that which would have resulted if the parent had itself purchased the stock.

If the stockholders of a corporation which owns all the stock of a subsidiary corporation obtain cash from that subsidiary, in effect they have received a dividend to the same extent as would be the case if the cash had been * * * distributed by the parent to the stockholders. * * *

[H. Rept. 2319, 81st Cong., 2d Sess. A53 (1950), 1950-2 C.B. 380, 420.]

See also S. Rept. 2375, 81st Cong., 2d Sess. 42-43 (1950), 1950-2 C.B. 483, 514.

In this case, the cash received by petitioners constitutes assets withdrawn from International in exchange for stock of its parent, McDermott, and the parties agree that section 304 applies to the cash. However, in receiving International common in return for McDermott common, petitioners did not withdraw assets from International or McDermott. The transaction resulted in a change in the ownership structure of the two corporations. Congress did not intend to prevent such a change in corporate ownerhip by enacting section 304.

Respondent argues, to the contrary, that the abuse in *Wanamaker* that Congress sought to remedy was the automatic capital gain characterization of an indirect redemption of a parent corporation's stock through an exchange between its subsidiary and its shareholders. Respondent maintains that both section 115(g)(2) and section 304 were designed to treat the indirect redemption of a parent corporation's stock through the use of a subsidiary as if it were a direct redemption by the parent corporation from its own shareholders. While the language and the legislative history support respondent's interpretation of section 115(g)(2), we cannot agree that section 304(a)(2) was enacted

for the same purpose or that the acquisition of the McDermott common by International fulfills the concept of a redemption.

In enacting section 304(a)(2), Congress changed the language of section 115(g)(2) to require the receipt of property for its application. This change in the language of the statute supports our view that the purpose of section 304(a)(2) was to prevent the withdrawal by shareholders of assets from corporate solution without a testing for dividend equivalency.

Respondent relies on *Radnitz v. United States*, 294 F.2d 577, 578 (2d Cir. 1961), in which the court said that the "clear intent [of section 304] is to make all sales of stock to related corporations subject to the rules of section 302." Respondent has ignored the context in which this statement appears. The sentence that follows indicates that the Second Circuit was referring to sales of stock for which "proceeds," i.e., cash or other property, are received.

The issue in *Radnitz* concerned the receipt of cash for stock of a related corporation. The Second Circuit made no comment concerning the receipt of stock of the acquiring corporation in return for stock of a related corporation. In fact, respondent, himself, has conceded that section 304, and therefore section 302, does not apply to the sale of stock between related corporations when the related corporations are brother and sister.

Respondent also relies on sections 1.304-1(a) and 1.304-3(a), Income Tax Regs. Section 1.304-1(a), Income Tax Regs., provides:

Except [for situations not relevant in this case], section 304 is applicable where a shareholder sells stock of one corporation to a related corporation as defined in section 304. Sales to which section 304 is applicable shall be treated as redemptions subject to sections 302 and 303.

At first glance section 1.304-1(a), Income Tax Regs., seems to indicate that the sale in its broadest sense of stock of one corporation to a related corporation is the transaction that triggers the application of section 304. However, the statute, itself, will not permit such an interpretation, and a careful reading of the regulation permits an alternative interpretation.

A regulation may not go beyond the purview of the statute or create a rule that is out of harmony with the statute. *Commissioner v. Acker,* 361 U.S. 87 (1959); *United States v. Calamaro,* 354 U.S. 351 (1957); *Manhattan Co. v. Commissioner,* 297 U.S. 129 (1936). However, it is also a well-recognized maxim that in interpreting a regulation, a court should, if possible, avoid a construction that will bring into question the validity of the regulation. *Northern Natural Gas Co. v. O'Malley,* 277 F.2d 128 (8th Cir. 1960); *Newman v. Commissioner,* 76 F.2d 449 (5th Cir. 1935), affg. 29 B.T.A. 53 (1933); *Steen v. Commissioner,* 61 T.C. 298 (1973), affd. per curiam 508 F.2d 268 (5th Cir. 1975).

We believe that section 1.304-1(a), Income Tax Regs., can and should be interpreted and applied in light of these principles. The statute states that property must be received by a shareholder when the shareholder sells stock of one corporation to a related corporation before section 304 will apply. Although the regulation does not specifically reiterate the language of the statute, it refers to the sale of stock of one corporation to a related corporation "as defined in section 304." Because the definitions in section 304 include the requirement of a receipt of property, the regulation also should be construed to include the same requirement, and we so conclude. Under this construction, section 304 does not apply in the instant case.

Section 1.304-3(a), Income Tax Regs., provides:

Sec. 1.304-3. Acquisition by a subsidiary.

(a) If a subsidiary acquires stock of its parent corporation from a shareholder of the parent corporation, the acquisition of such stock shall be treated as though the parent corporation had redeemed its own stock. For the purpose of this section, a·corporation is a parent corporation if it meets the 50 percent ownership requirements of section 304(c). The determination whether the amount received shall be treated as an amount received in payment in exchange for the stock shall be made by applying section 303, or by applying section 302(b) with reference to the stock of the issuing parent corporation. If such distribution would have been treated as a distribution of property (pursuant to section 302(d)) under section 301, the entire amount of the selling price of the stock shall be treated as a dividend to the seller to the extent of the earnings and profits of the parent corporation determined as if the distribution had been made to it of the property that the subsidiary exchanged for the stock. In such cases, the transferor's basis for his remaining stock in the

parent corporation will be determined by including the amount of the basis of the stock of the parent corporation sold to the subsidiary.

The first sentence of section 1.304-3(a), Income Tax Regs., if read literally and in isolation from the rest of the regulation, seems to assert that section 304(a)(2) applies whenever a subsidiary acquires stock of its parent, regardless of whether the consideration given by the subsidiary constitutes property. However, such a reading of the regulation is out of harmony with the statute, and is, therefore, untenable. *Commissioner v. Acker, supra; United States v. Calamaro, supra; Manhattan Co. v. Commissioner, supra.*

The reference in the fourth sentence of the regulation to "the property" given by the subsidiary makes it evident that section 1.304-3(a) of the regulations addresses only cases in which subsidiaries acquire stock of parents in return for property. Reading the language of the regulation in light of its underlying statute, and in such a manner as to avoid a construction that brings the validity of the regulation into question (*Northern Natural Gas Co. v. O'Malley, supra; Newman v. Commissioner, supra; Steen v. Commissioner, supra,*), we conclude that section 1.304-3, Income Tax Regs., refers only to cases in which subsidiaries have acquired parent stock in exchange for property as defined in section 317(a).

Finally, respondent maintains that if section 304 does not apply in this case, petitioners will be able to avoid the provisions of section 355.[10] Respondent characterizes the

---

[10]Sec. 355 provides in pertinent part:

SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.

(a) EFFECT ON DISTRIBUTEES.—

(1) GENERAL RULE.—If—

    (A) a corporation (referred to in this section as the "distributing corporation")

      (i) distributes to a shareholder, with respect to its stock, or

      (ii) distributes to a security holder, in exchange for its securities,

solely stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,

    (B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),

    (C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

transaction in this case as an indirect redemption by a parent corporation (McDermott) of its own stock in return for the stock of its subsidiary (International). Had

(D) as part of the distribution, the distributing corporation distributes—
(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or
(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax,

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

(2) NON PRO RATA DISTRIBUTIONS, ETC.—Paragraph (1) shall be applied without regard to the following:
(A) whether or not the distribution is pro rata with respect to all of the shareholders of the distributing corporation,
(B) whether or not the shareholder surrenders stock in the distributing corporation, and
(C) whether or not the distribution is in pursuance of a plan of reorganization (within the meaning of section 368(a)(1)(D)).

(3) LIMITATIONS.
(A) EXCESS PRINCIPAL AMOUNT.—Paragraph (1) shall not apply if—
(i) the principal amount of the securities in the controlled corporation which are received exceeds the principal amount of the securities which are surrendered in connection with such distribution, or
(ii) securities in the controlled corporation are received and no securities are surrendered in connection with such distribution.
(B) STOCK ACQUIRED IN TAXABLE TRANSACTIONS WITHIN 5 YEARS TREATED AS BOOT.—For purposes of this section (other than paragraph (1)(D) of this subsection) and so much of section 356 as relates to this section, stock of a controlled corporation acquired by the distributing corporation by reason of any transaction—
(i) which occurs within 5 years of the distribution of such stock, and
(ii) in which gain or loss was recognized in whole or in part,
shall not be treated as stock of such controlled corporation, but as other property.
(C) PROPERTY ATTRIBUTABLE TO ACCRUED INTEREST.—Neither paragraph (1) nor so much of section 356 as relates to paragraph (1) shall apply to the extent that any stock, securities, or other property received is attributable to interest which has accrued on securities on or after the beginning of the holder's holding period.

\*      \*      \*      \*      \*      \*

(b) REQUIREMENTS AS TO ACTIVE BUSINESS.—
(1) IN GENERAL.—Subsection (a) shall apply only if either—
(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, or
(B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporations and each of the controlled corporations is engaged immediately after the distribution in the active conduct of a trade or business,
(2) DEFINITION.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—
(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,
(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

McDermott distributed the International stock to its shareholders in this way, section 355 would have required dividend treatment of the stock of International received by petitioners. We have already rejected respondent's argument that section 355 was meant to prevent indirect redemptions. *Dunn Trust v. Commissioner*, 86 T.C. 745 (1986).

Moreover, the transaction in this case differs from the exchange envisioned by respondent.

Had McDermott redeemed its stock and issued 30 million shares of International to petitioners, the corporations would have split up. As a result of the redemption, petitioners would have held an equity interest in International and would have given up most of their interest in McDermott.

In this case, however, petitioners exchanged their McDermott stock with International for stock in International. After this transaction, International became the parent of McDermott, and petitioners became the owners of a direct equity interest in the operations of International and an indirect equity interest in the operations of McDermott.

A transaction in which a parent redeems its own stock by distributing the stock of a subsidiary divides the corporations, and assets are withdrawn from the parent. The redeeming shareholders can bail out corporate assets in such a transaction by selling off the stock of the subsidiary. The result can be equivalent to a distribution of a dividend. Accordingly, a division actually effected by such a transaction is generally tested for dividend equivalance under section 302.[11]

---

(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

(D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business—

(i) was not acquired directly (or through one or more corporations) by another corporation within the period described in subparagraph (B), or

(ii) was so acquired by another corporation within such period, but such control was so acquired only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period.

[11]Sec. 355 permits tax-free treatment of some divisive redemptions. However, divisive redemptions that do not meet the tests of sec. 355 must be tested for dividend equivalency under sec. 302. Distributions by a corporation of its own preferred stock that contain the

The transaction in this case, however, was not divisive, and, therefore, the anti-bailout provisions of section 355 are not relevant. After the December 1982 exchange, a holder of International common could not dispose of his interest in International without disposing of his interest in McDermott at the same time. Thus, no bailout was possible in this case.

Respondent maintains, however, that a holding for petitioners in this case will permit other taxpayers to bail out assets from corporate solution. In support of his argument, respondent presents two hypothetical examples. Respondent's first example involves an exchange of stock as follows:

Assume that P Corp. owns all the stock of its subsidiary, S Corp. S Corp. has no other class of stock. The value of P is ten times greater than the value of S. The P shareholders desire to cash in on the stock of S at capital gains rates. To this end, S offers to exchange newly created shares of itself (the same class of stock) representing 80 percent of the voting power in S to P's shareholders for shares of P on a value-for-value basis. The P shareholders participate in the exchange with the intent of later disposing of the stock of S at capital gains rates. A direct distribution would have been taxed under I.R.C. sections 301 or 302. Respondent's position in this case would treat this indirect distribution in the above transaction just as a direct distribution would have been treated. Petitioners' position would undermine I.R.C. section 355 by treating the transaction as a nontaxable exchange under I.R.C. section 351 followed by a sale under I.R.C. section 1001 at capital gains rates. [Respondent's Memorandum in Reply to Petitioners' Memorandum in Support of Petitioners' Motion for Partial Summary Judgment 19-20 n. 5.]

Respondent's second example involves the receipt of preferred stock of the subsidiary by shareholder of the parent, as follows:

Suppose P corporation owns all the stock of S corporation and that P and S each have substantial earnings and profits. P's shareholders want to receive the economic benefit of these earnings but * * * want to avoid dividend treatment. To this end, they cause S to acquire from each of them 10 percent of their respective P shareholdings in exchange solely for nonvoting limited preferred stock of S. * * * Sometime after the exchange, the P shareholders sell all of their S preferred stock for cash to unrelated third parties. Absent the application of section 304(a)(2), the

potential for bailout are usually tax free under sec. 305, but the disposition of such stock must be tested under sec. 302 as provided in sec. 306.

above example results in the following tax consequences. The exchange of P stock for preferred stock will result in capital gain to the P shareholders. They will thus take a fair market value basis in the S preferred stock. Their subsequent sale of the preferred stock will result in no taxation to them assuming its value remains constant. * * * The S preferred stock will not be section 306 stock in the hands of the P shareholders since, even assuming *arguendo* that section 306(c)(3) applies to parent-subsidiary transactions, the requirements of section 306(c)(3) are not met in that the P stock/S preferred stock exchange was not a transaction described in section 351.* Since the S preferred stock is not section 306 stock, its sale by the P shareholders will not result in ordinary income to them under section 306. [Respondent's Memorandum in Reply to Petitioners' Memorandum in Opposition to Respondent's Motion for Partial Summary Judgment 15-16.]

*The shareholders of P acquired no control of S in the exchange. Control of S continued to be vested exclusively in P. Thus, the control prerequisite to application of sec. 351 was not satisfied. Sec. 351 must apply to the exchange in order for par. 306(c)(3) to be applicable.

Respondent may have discovered a potential for bailout under the provisions of section 304.[12] However, the examples presented by respondent are not before us, and we decline to adopt an interpretation of section 304 in contravention of the language of the statute and its legislative history.

Moreover, it seems apparent that the bailout potential perceived by respondent in his examples can be achieved by a value-for-value exchange of stock or an exchange of common stock for preferred between brother and sister corporations, and respondent has conceded that section 304 does not apply to the stock of the acquiring corporation received in a brother-sister transaction described in section 304(a)(1).

To reflect the foregoing,

*An appropriate order will be issued.*

---

[12]Bittker and Eustice recognize this potential for bailout as a weakness in section 304 as it is presently written. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.32, at 9-53—9-54 (4th ed. 1979).