Edward J. and Janice W. CAAMANO,
Petitioners–Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.

No. 88–4794.

United States Court of Appeals,
Fifth Circuit.

Aug. 7, 1989.

Ernest J. Brown, Asst. Atty. Gen., Richard Thornburgh, Atty. Gen., U.S. Dept. of Justice, Tax Div., William S. Rose, Jr.,

Gary R. Allen, Chief, Asst. Attys. Gen., Dept. of Justice, Washington, D.C., for respondent-appellant.

John P. Carroll, Jr., Leslie J. Hoffman, James D. Liss, Richard M. Fabbro, Davis, Polk & Wardwell, New York City, for petitioners-appellees.

Before GEE, GARZA and JONES, Circuit Judges.

GEE, Circuit Judge:

### Facts

Taxpayers Edward and Janice Caamano, the appellees, were shareholders of McDermott, Inc. McDermott was a Delaware corporation and the parent of McDermott International, its Panamanian, wholly-owned subsidiary. The Board of Directors decided to change the corporate structure to make McDermott, Inc. the subsidiary of McDermott International. The Tax Court stated the motivation for the change was to reduce corporate taxes.

To make the structural change, McDermott International gave 30 million shares of its own common stock and 35 cents per share to the shareholders of McDermott, Inc. in return for 30 million shares of common stock of McDermott, Inc. Since the taxpayers in the today's case were shareholders, they were affected by the transaction. The taxpayers exchanged 50 shares of stock of McDermott, Inc. for $17.50 and 50 shares of McDermott International.

Following the exchange, McDermott International held 68% of the voting power of McDermott, Inc., whose former shareholders then held 90% of the voting power in McDermott International. The Tax Court held that this exchange was not taxable as a distribution under I.R.C. section 304(a)(2)(A).

### Analysis

■ The Tax Court was faced with deciding whether the McDermott International common stock fell within the meaning of "property" under section 304(a)(2)(A).

As is mentioned above, the primary purpose for the McDermott restructuring was to lower corporate taxes. The prospectus issued by McDermott International stated in relevant part:

The principal purpose of the reorganization is to enable the McDermott Group to retain ... earnings from operations outside the United States without subjecting such earnings to United States income tax. This will enable the McDermott Group to compete more effectively with foreign companies by taking advantage of additional opportunities for expansion which require long-term commitments, the redeployment of assets and the reinvestment of earnings.

According to the offer, McDermott International was to exchange one share and 35 cents for each McDermott share. In December 1982, McDermott International accepted all tenders of individual shareholders owning 99 or fewer shares, and some of the shares tendered by shareholders owning more than 100 shares. The Tax Court found that the taxpayers tendered 50 shares and received 50 shares of McDermott International and $17.50.

Tax treatment of the exchange turns on interpretation of I.R.C. section 304(a)(2), which provides:

(2) Acquisition by subsidiary.—For purposes of sections 302 and 303, if—

(A) in return for *property*, one corporation acquires from a shareholder of another corporation stock in such corporation, and

(B) the issuing corporation controls the acquiring corporation,

then such property shall be treated as a distribution in redemption of the stock of the issuing corporation.

*Id.* (emphasis added).

The term "control" in this statute requires "ownership of stock possessing at least 50% of the total combined voting power of all classes of stock entitled to vote, or at least 50% of the total value of shares of all classes of stock." I.R.C. section 304(c).

The Tax Court noted that if section 304(a)(2) applied to the taxpayers exchange,

then the stock and cash received would have to be treated as a distribution in redemption of the McDermott stock. Section 302 would then be applied to determine the character of the receipts. The parties already agreed that the cash constituted "property" under section 304(a)(2). They also agreed that if section 304 were not to apply to the stock of McDermott International, the receipt of it would be taxed under section 1001.

The term "property" as used in section 304(a)(2)(A) is defined in another section of the Code, namely 317(a), which provides:

> For purposes of this part, the term "property" means money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock).

Commentators are split on the issue of whether the stock received in a section 304(a)(2) transaction is properly termed "property".[1] The Tax Court, hearing this issue for the first time, held that such stock did not constitute property. The court drew support for its view from section 304(b)(3)(B) which states that:

> (B) Certain assumptions of liability, etc.—
>
> (i) In general.—In the case of an acquisition described in section 351, subsection (a) shall not apply to any liability—
>
> (I) assumed by the acquiring corporation, or
>
> (II) to which the stock is subject,
>
> if such liability was incurred by the transferror to acquire the stock. For purposes of the preceding sentence, the term "stock" means stock referred to in paragraph (1)(B) or (2)(A) of subsection (a).

This section thus resolves the lack of clarity as to whether section 304 referred to distributions by the acquiring corporation to the shareholders of the parent, or the distribution by the parent to its own shareholders. The section demonstrates that section 304 does not apply to the acquiring corporation's assumption of liabilities. Nor does it apply to the liabilities to which the stock is subject. The provision would apply to the acquiring corporation's distribution of property to shareholders of another corporation.

As a result of this interpretation, the Tax Court concluded that McDermott International distributed its own stock to the taxpayers in the December 1982 exchange and that the stock is not properly characterized "property" for the purposes of I.R.C. section 304. The result of the decision is that the property received is taxed under more favorable capital gains rates rather than as dividends. The issue under appeal is controlled by the tax code of 1954, rather than today's code.[2]

The Tax Court noted too that the Conference Report makes it clear that the Congress was concerned with characterization of property subject to both sections 304 and 351. Since the distribution of stock in the instant case was the corporation's own stock, section 304 does not apply. The court's reasoning is persuasive and is reinforced by other courts' interpretations of the purpose of section 304. In *United States v. Collins*, 300 F.2d 821 (1st Cir. 1962), the First Circuit stated:

> Section 304 was enacted in the 1954 Code to close loopholes in the tax laws deriving from transactions involving "brother-sister corporations." This involves situations where one or more individuals are in effective control of each of

---

1. Some commentators think that the stock of the subsidiary received in a section 304(a)(2) transaction is not property. *See e.g.,* Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.32, pp. 9–53–9–54 (4th ed.1979); Frost & Burns, "Current Tax Problems While Operating as a Corporation," 1958 S. Cal. Tax Inst. 117, 158 (1958). Tiger has argued both ways. *See* Tiger, "Sales of Stock to Related Corporations: Current Problems Under Section 304," 40 J. Taxn. 86, 87 (1974) (stock of the acquiring corporation is *not* property); Ti-

ger, "Redemption Through the Use of Related Corporations: New and Old Problems Under Section 304," 39 Tax.L.Rev. 79 (1984) (stock of a subsidiary issued by the subsidiary to shareholders of the parent in exchange for the parent's stock *is* property).

2. The issue would be largely academic under TRA 1986, since ordinary income and capital gain rates are the same.

two corporations, and one of the corporations acquires stock of the other corporation.

*Id.* at 822.

The Commissioner argues, however, that Congress sought to change section 115(g)(2), from which section 304 was derived, after the decision in *Rodman Wanamaker Trust v. Commissioner*, 11 T.C. 365 (1948), affirmed, 178 F.2d 10 (3d Cir.1949). *Wanamaker* treated cash received by the taxpayer from a subsidiary in return for shares of stock in the parent corporation as sale proceeds rather than dividends.

The Tax Court found that while section 304 applied to the cash, the taxpayers did not withdraw assets from either McDermott, Inc. or McDermott International; and the transaction resulted in a change of the ownership structure of the two corporations, which Congress did not intend to prevent under section 304. In addition, the court noted an important change in the language of section 304(a)(2) from that in 115(g)(2): the receipt of property was required for the statute to apply. The court's view of the "property" term is sound in light of the legislative history and purpose for the provision.

We also reject the Commissioner's argument that section 355 was meant to prevent indirect redemptions based on its earlier decision in *Dunn Trust v. Commissioner*, 86 T.C. 745 (1986). The anti-bailout provisions of section 355, which allow redeeming shareholders to "bail out" corporate assets by selling the stock of the subsidiary, do not apply in this case. As the Tax Court stated, after December 1982, a holder of International Common could not sell his interest in McDermott International without simultaneously selling his interest in McDermott, Inc. No bail-out was thus possible. The Tax Court thus properly held that section 355 was not applicable and its ruling is in all respects

AFFIRMED.