**Rohinton K. BHADA, Patricia A. Bhada, Petitioners–Appellees,**

v.

**COMMISSIONER, INTERNAL REVENUE SERVICE, Respondent–Appellant.**

No. 88–2118.

United States Court of Appeals, Sixth Circuit.

Argued June 13, 1989.

Decided Dec. 19, 1989.

**40**

John P. Carroll, Jr., argued, Leslie J. Hoffman, James D. Liss, Richard M. Fabbro, Davis, Polk & Wardell, New York City, for petitioners-appellees.

William F. Nelson, I.R.S., Gary R. Allen, Acting Chief, William S. Rose, Ernest J. Brown, argued, U.S. Dept. of Justice, Appellate Section Tax Div., Washington, D.C., for respondent-appellant.

Before: KEITH and WELLFORD, Circuit Judges; and GILMORE *, District Judge.

WELLFORD, Circuit Judge.

We shall refer to appellees collectively as "Bhada" in this appeal from a decision of the Tax Court reported at 89 T.C. 959 (1987). The opinion of Judge Nims of the Tax Court set out the following stipulated facts in this case:

> Petitioners Rohinton and Patricia Bhada were residents of Alliance, Ohio, and petitioners Edward and Janice Caamano were residents of New Orleans, Louisiana, when the petitions in these cases were filed. There are approximately 87 docketed cases in this Court involving the same transaction, and these two cases have been identified as test cases for the purpose of resolving the preliminary issue concerning the applicability of section 304 to the transaction in question.

McDermott, Inc. (McDermott), was a Delaware corporation at all relevant times. From 1959 until December 10, 1982, McDermott was the parent corporation to a group of corporations hereinafter referred to as the McDermott Group. From 1959 until December 10, 1982, McDermott International, Inc. (International), was a wholly owned subsidiary of McDermott and a controlled foreign corporation within the meaning of section 957.

Pursuant to a plan of reorganization adopted on October 28, 1982, by the boards of directors of McDermott and International, International made an offer to exchange cash and shares of its own stock (International common) for shares of the common stock of McDermott (McDermott common). International distributed a prospectus dated November 24, 1982 (the prospectus), which stated the terms and conditions on which the offer was made.

The prospectus stated:

> "The principal purpose of the organizations is to enable the McDermott Group to retain, reinvest and redeploy earnings from operations outside the United States without subjecting such earnings to United States income tax. This will enable the McDermott Group to compete more effectively with foreign companies by taking advantage of additional opportunities for expansion which require long-term commitments, the redeployment of assets and the reinvestment of earnings. The reorganization will also result in direct shareholder participation in the accumulated and future profits of International earned abroad rather than shareholder participation in such foreign earnings only after they are first distributed to the Delaware Company and subjected to corporate income tax at a rate substantially higher than the average rate prevailing in the areas in which International operates. Finally, the reorganization will permit International to invest its accumulated foreign earnings

---

* The Honorable Horace W. Gilmore, United States District Court for the Eastern District of Michigan, sitting by designation.

in the United States without Federal income tax being imposed on the Delaware Company upon the making of such investment.

\*    \*    \*    \*    \*    \*

The aggregate amount reported by [McDermott] as Subpart F income of International in the five years ended March 31, 1982 was approximately $20,000,000 and the aggregate United States income tax imposed thereon was approximately $9,000,000. \* \* \* \* If, however, the business of International continues in its present form and at levels now anticipated by management for the five succeeding years, it is anticipated that the aggregate Subpart F income generated by International will be approximately $585,-000,000 for such years and the aggregate United States income tax imposed on that total amount would (at currently prevailing rates) be approximately $220,-000,000. In the opinion of Davis Polk & Wardwell, United States Counsel to International, the reorganization, under present laws and regulations, will enable the McDermott Group to avoid future Subpart F income tax costs because, after the exchanges pursuant to the offer, International will no longer be a CFC [controlled foreign corporation]."

Under the terms of the offer, International was to exchange 1 share of International common plus $0.35 for each outstanding share of McDermott common. The offer was conditioned upon the tendering of a minimum of 22 million shares of McDermott common. International also retained the right to refuse to accept more than 30 million shares of McDermott common.

On December 10, 1982, International accepted, pursuant to the terms of the offer, all shares of McDermott common tendered by each shareholder holding 99 or fewer of such shares and accepted a portion of all the shares of McDermott common tendered by each shareholder holding 100 or more of such shares, as was determined on the terms concerning proration stated in the Prospectus. International acquired 30 million shares of McDermott common for which it gave $10,500,000 and 30 million shares of International common. As a result of the exchange, International held approximately 68 percent of the voting power in McDermott, and former holders of McDermott common who participated in the exchange held approximately 90 percent of the voting power in International.

Petitioners participated in the December 1982 transactions. In response to the offer, petitioners Rohinton and Patricia Bhada tendered to International 26 shares of McDermott common and received in return 26 shares of International common and $9.10 in cash. Petitioners Edward and Janice Caamano tendered to International 50 shares of McDermott common and received in return 50 shares of International common and $17.50 in cash. On December 10, 1982, the fair market value of one share of International common was $19.

89 T.C. at 960–62.

The Tax Court held that shares of McDermott International (MI) received by Bhada do not constitute "property" within the meaning of § 304(a)(2)(A) of the Internal Revenue Code. That provision, the interpretation of which is key to this decision, reads as follows:

(2) ACQUISITION BY SUBSIDIARY. —For purposes of sections 302 and 303, if—

(A) in return for property, one corporation acquires from a shareholder of another corporation stock in such other corporation, and

(B) the issuing corporation controls the acquiring corporation, then such property shall be treated as a distribution in redemption of the stock of the issuing corporation.

To begin our discussion of this case of first impression, we look to the meaning of the word "control" as utilized in § 304(a)(2)(B) dealing with acquisition by a corporation of corporate stock from a shareholder where the issuing corporation "controls" the acquiring corporation. Such "control" means ownership of at least 50% of the voting power of the total shares of

stock. IRC § 304(c). The question in this case is whether § 304(a)(2) applies to the December 1982 transaction at issue. We also consider "control" as it is used in other sections of the Internal Revenue Code discussed by the parties as material.

"Control," for purposes of another relevant section of the IRC (§ 368), means stock ownership of at least 80% of the total combined voting power of all classes of stock entitled to vote and 80% of non-voting stock. Section 368 of the IRC mandates this standard with respect to § 351 transactions. If property is received, in addition to stock, by persons transferring property to the corporation where § 351 applies, gain must be recognized to the extent of the amount of money received, plus the fair market value of any other property received. As observed by Judge Nims, property received in a § 351 transaction is subject to capital gains treatment rather than treatment as a dividend. Bhada asserts that the Tax Court was correct in treating this transaction in question as a capital transaction. The general rule, under § 351, regarding transfer to a corporation controlled by the transferor is that no gain or loss is recognized if property is transferred to the issuing corporation solely in exchange for such stock or securities and thereafter the transferor of property is in control under the 80% test set out in § 368, applicable to § 351 transfers.

As noted by the Tax Court, "[t]he parties have agreed that the cash received by petitioners is property for purposes of section 304(a)(2)." The Tax Court, however, held that the shares of stock involved were not such "property" (MI common received by Bhada). The Tax Court conceded that the issue was before it "for the first time" and that "commentators are split on this issue." 89 T.C. at 963 n. 3.

"Property" is defined in § 317(a):

For purposes of this part, the term "property" means money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock).

Taxpayers similarly situated to Bhada were Mr. and Mrs. Caamano, whose appeal arising out of this same transaction (50 shares instead of 26) was taken to the Fifth Circuit. That court has recently decided this same issue and has affirmed the Tax Court decision at issue before us. *Caamano v. Commissioner of Internal Revenue*, 879 F.2d 156 (5th Cir.1989). The principal basis of *Caamano* was set out as follows:

Since the distribution of stock in the instant case was the corporation's own stock, section 304 does not apply. The court's reasoning is persuasive and is reinforced by other courts' interpretations of the purpose of section 304. In *United States v. Collins*, 300 F.2d 821 (1st Cir.1962), the First Circuit stated: "Section 304 was enacted in the 1954 Code to close loopholes in the tax laws deriving from transactions involving 'brother-sister corporations.' This involves situations where one or more individuals are in effective control of each of two corporations, and one of the corporations acquires stock of the other corporation."

*Id.* at 822.

879 F.2d at 158–59.

*Caamano* added another basis for its affirmance:

The Tax Court found that while section 304 applied to the cash, the taxpayers did not withdraw assets from either McDermott, Inc. or McDermott International; and the transaction resulted in a change of the ownership structure of the two corporations, which Congress did not intend to prevent under section 304. In addition, the court noted an important change in the language of section 304(a)(2) from that in 115(g)(2): the receipt of property was required for the statute to apply. The court's view of the "property" term is sound in light of the legislative history and purpose for the provision.

879 F.2d at 159.

Finally, Judge Gee held, in overruling the Commissioner's contention concerning application of § 355 of the IRC:

We also reject the Commissioner's argument that section 355 was meant to prevent indirect redemptions based on its earlier decision in *Dunn Trust v. Commissioner*, 86 T.C. 745 (1986). The anti-bailout provisions of section 355, which allow redeeming shareholders to "bail out" corporate assets by selling the stock of the subsidiary, do not apply in this case. As the Tax Court stated, after December 1982, a holder of International Common could not sell his interest in McDermott International without simultaneously selling his interest in McDermott, Inc. No bail-out was thus possible. The Tax Court thus properly held that section 355 was not applicable and its ruling is in all respects AFFIRMED.

879 F.2d at 159.

*Dunn Trust v. Commissioner*, 86 T.C. 745 (1986), dealt with whether a portion of stock in AT & T owned by petitioner and receipt by that taxpayer of stock in seven regional telephone companies arising out of a reorganization of AT & T was subject to the "boot rule" of IRC § 355(a)(3)(B).

In the *Dunn* case, IRS had ruled a portion of PacTel group stock was taxable as income to AT & T shareholders. The Tax Court held there was no "bail out" in *Dunn;* no taxable event occurred, thus sustaining the taxpayer's position. The effect of this holding was that direct distributions of stock of existing corporations (such as McDermott) were held not to be on a par with "indirect distribution of such stock through the use of holding companies." *See also Commissioner v. Stickney*, 399 F.2d 828 (6th Cir.1968), *aff'g* 46 T.C. 864 (1966).

B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders*, ¶ 9.32 at 9–53 and 9–54 (4th ed. 1979), apparently concluded that the stock of the subsidiary received in a § 304(a)(2) transaction was not "property." In the Fifth Edition of their work (1987), the authors state:

> If a subsidiary corporation (the "controlled" or "acquiring" corporation) acquires stock of its parent (the "issuing" corporation) from a shareholder thereof, § 304(a)(2) provides that any money or other property paid for the stock must be treated as a distribution in redemption of the parent corporation's stock. Whether the transaction, so viewed, qualifies for sale/exchange rather than dividend treatment depends on the normal rules prescribed by §§ 302–303.

\*  \*  \*  \*  \*  \*

In applying § 304(a)(2), the concept of control is crucial, since § 304(a)(2) encompasses an acquisition of stock only if the issuing corporation controls the acquiring corporation.

The issues in this case are close and the interplay of the various sections of the Internal Revenue Code are both complex and confusing. We give some deference to the conclusions of the Tax Court, particularly when another circuit court has affirmed the Tax Court on the identical issue. We believe, upon reflection, that the Tax Court's decision was not erroneous in its analysis.

Accordingly, we AFFIRM the decision of the Tax Court.