117 T.C. No. 8


UNITED STATES TAX COURT


GARY D. AND LINDY H. COMBRINK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]


Docket No. 13580-99.                    Filed August 23, 2001.

---

[*]On May 15, 2001, the Court filed its Opinion in this case
at 116 T.C. No. 24.  On August 7, 2001, respondent filed a Notice
of Proceeding in Bankruptcy, in which respondent notified the
Court that this Court's proceedings should have been stayed with
respect to petitioners Gary D. Combrink and Lindy H. Combrink,
who, on January 29, 2001, commenced a case in the United States
Bankruptcy Court for the Western District of Oklahoma, under 11
U.S.C. Chapter 7 of the Bankruptcy Code.  Petitioners herein had
heretofore filed a timely petition with this Court on August 10,
1999.

Pursuant to 11 U.S.C. sec. 362(a)(8)(1988), the proceedings
in this Court were automatically stayed on January 29, 2001, thus
nullifying our Opinion filed May 15, 2001.

An Order was filed by the Bankruptcy Court on July 11, 2001,
discharging the debtors Gary Dean Combrink and Lindy Hayton
Combrink from all dischargeable debts.  The automatic stay of
proceedings in this case was thereby lifted.

By Order dated August 14, 2001, the Opinion in this case at
116 T.C. No. 24 was withdrawn.  This Opinion is unchanged from
the previous Opinion.

P owned 100 percent of the stock in two corporations, C and L. During 1995 and 1996, C made a series of remittances totaling $89,728.73 which were treated as loans from C to P, followed by subsequent loans from P to L. P also lent additional funds to L. Thereafter, in late 1996, promissory notes payable by L to P in the amount of $252,481.03 were converted into a single promissory note of $77,481.03 and additional paid-in capital of $175,000.00. Then, in December of 1996, P transferred his shares in L to C in exchange for release from the $174,133.20 liability he had previously incurred to C.

Held: To the extent of $12,247.70, the transfer of L stock to C in exchange for debt release is excepted from redemption characterization pursuant to sec. 304(b)(3)(B), I.R.C., and, under secs. 351 and 357, I.R.C., generates no gain or loss.

Held, further, to the extent of $161,885.50, the stock transfer is to be recast as a redemption, and taxed as a dividend distribution, in accordance with secs. 301, 302, and 304, I.R.C.

Kerry R. Hawkins and Kenneth W. Klingenberg, for petitioners.

Brian A. Smith and C. Glenn McLoughlin, for respondent.

OPINION

NIMS, Judge: Respondent determined a Federal income tax deficiency for petitioners' 1996 taxable year in the amount of $56,449.00. The principal issue to be decided is the proper application of section 304, which could in turn require application of sections 301 and 302, to the facts of this case.

Additional adjustments made in the statutory notice of deficiency are computational in nature and will be resolved by our holding herein.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

This case was submitted fully stipulated pursuant to Rule 122, and the facts are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference. At the time the petition was filed in this case, petitioners resided in Enid, Oklahoma.

The primary dispute in this matter focuses on the proper treatment for tax purposes of certain transactions involving petitioner Gary D. Combrink and two related corporations, Cost Oil Operating Company (COST) and Links Investment, Inc. (LINKS). Mr. Combrink incorporated COST on January 7, 1983, and has at all times owned 100 percent of the company's stock. COST, a subchapter C corporation, is engaged in the operation of working interests in oil and gas wells. Mr. Combrink incorporated LINKS on November 12, 1992, and has at all relevant times through

November of 1996 owned all outstanding shares. LINKS, also a subchapter C corporation, was formed with the intention of opening and operating a golf course.

During the 1990's, Mr. Combrink received various amounts from COST which were treated as loans from the corporation to Mr. Combrink. In two instances, promissory notes payable to COST were signed by Mr. Combrink. A note in the amount of $56,404.47 was signed on December 31, 1992, and a note for $17,000.00 was signed on December 31, 1993. Additional loan amounts were reflected on the corporate records as accounts receivable due from Mr. Combrink. As of May 25, 1995, the balance of COST's accounts receivable from shareholders was $11,000.00. Thereafter, during 1995 and 1996, this balance was increased as a result of transactions taking one of two forms.

First, in 1995, COST repaid sums owed to third parties by Mr. Combrink in his personal capacity, as follows:

| Date | Amount |
|---|---|
| May 26, 1995 | $16,362.98 |
| August 31, 1995 | 15,729.17 |
| December 20, 1995 | 11,228.64 |
| December 29, 1995 | 1,102.37 |
| Total | $44,423.16 |

The August 31, 1995, payment was made in satisfaction of amounts owed by Mr. Combrink to a loan broker who had assisted in finding a lender to finance LINK's operations. The December 20, 1995,

payment repaid sums owed by Mr. Combrink to a creditor for equipment used exclusively by LINKS. (The record does not reflect the purpose or recipient of the remaining two payments.)

The second type of transaction recorded on COST's books as accounts receivable from Mr. Combrink took the form of payments made directly to LINKS in 1996. These payments are set forth below:

| Date | Amount |
|------|--------|
| April 29, 1996 | $1,000.00 |
| May 6, 1996 | 2,000.00 |
| May 15, 1996 | 3,500.00 |
| June 3, 1996 | 15,000.00 |
| June 5, 1996 | 23,805.57 |
| Total | $45,305.57 |

The foregoing nine accounts receivable transactions, totaling $89,728.73, were consistently treated by Mr. Combrink and his corporations as loans from COST to Mr. Combrink and as subsequent loans from Mr. Combrink to LINKS. LINKS recorded the amounts as accounts payable to stockholders, and the debt resulting from these and other funds advanced to LINKS by Mr. Combrink was memorialized by two promissory notes payable by LINKS to Mr. Combrink in the total amount of $252,481.03.

Subsequently, on October 15, 1996, Mr. Combrink and LINKS agreed to convert the above-referenced promissory notes payable by LINKS to Mr. Combrink into one promissory note in the amount of $77,481.03 and additional paid-in capital of $175,000.00. No further shares were issued at this time. Then, on December 1, 1996, Mr. Combrink transferred all of his stock in LINKS to COST in exchange for COST's releasing Mr. Combrink from a liability to COST in the amount of $174,133.20, apparently consisting of the $56,404.47 promissory note, the $17,000.00 promissory note, the $11,000 accounts receivable balance as of May 25, 1995, and the $89,728.73 added to the accounts receivable balance in 1995 and 1996 as detailed above.

On their timely filed joint 1996 U.S. Individual Income Tax Return, Form 1040, petitioners did not report any income or loss as a result of the release transaction. Respondent determined that $174,133.20 must be included in income as a dividend pursuant to sections 301, 302, and 304.

## Discussion

Section 304 mandates that certain transactions involving shares in related corporations be recast for tax purposes as redemptions, the tax treatment of which is then governed by section 302 and potentially section 301. The parties here disagree with respect to whether section 304 is applicable to the December 1, 1996, transaction between Mr. Combrink and COST.

Petitioners advance two alternative arguments as to why section 304 should not be applied to the exchange of LINKS stock for debt release, one of which rests on a general appeal to policy and the other of which relies on a specific statutory exception. As a policy matter, petitioners emphasize that Congress, in enacting section 304, sought to prevent the "bailout" of corporate earnings as capital gain rather than ordinary income. Because it is petitioners' position that the transfer at issue does not manifest the characteristics of such a bailout, petitioners aver that it should not be subjected to the construct set up by section 304.

In the alternative, petitioners contend that the transaction here is specifically exempted from the redemption treatment otherwise required under section 304(a) by the exception established in section 304(b)(3)(B). According to petitioners, the disputed transfer involved COST's assumption of liability incurred by Mr. Combrink to acquire the LINKS stock. As such, petitioners claim that the transaction falls within the section 304(b)(3)(B) exception applicable in certain cases where there is an assumption of acquisition indebtedness.

Conversely, respondent asserts that to characterize the December 1996 transaction as a redemption pursuant to the rules of section 304(a) is consistent with both the language and the policy of the statute. Respondent further maintains that Mr.

Combrink's transfer of the LINKS stock to COST is not covered by the section 304(b)(3)(B) exception.  In respondent's view, the evidence fails to establish that the liability released by COST was incurred to acquire the transferred LINKS stock.  Respondent therefore alleges that the transaction must be taxed as a dividend in accordance with sections 302(d) and 301.

Thus, as framed by the parties' contentions, resolution of this matter requires determining the applicability of section 304 to the December 1996 transfer of LINKS stock.  In considering this broad question, we address in turn, to the extent relevant, each of three subissues.  The first is whether the subject transaction is, absent any exception, of a type intended to be covered by section 304(a).  If yes, the second question is whether section 304(b)(3)(B) exempts the transfer from the redemption characterization that subsection (a) would otherwise require.  Third, it will be necessary to analyze the appropriate tax treatment in light of the answers given to the foregoing inquiries.

I.  The General Rule--Section 304(a)

As previously indicated, section 304 mandates that certain transactions involving shares in related corporations be recast for tax purposes as redemptions.  The general rule is set forth in section 304(a) and provides in relevant part as follows:

SEC. 304(a).  Treatment of Certain Stock Purchases.--

(1) Acquisition by related corporation (other than subsidiary).--For purposes of sections 302 and 303, if--

(A) one or more persons are in control of each of two corporations, and

(B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control,

then (unless paragraph (2) applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock.  To the extent that such distribution is treated as a distribution to which section 301 applies, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation.

Accordingly, there are two elements required for a transaction to fall within the purview of section 304(a)(1). First, the transferor(s) of the issuing corporation's stock must be in control of both the issuing and the acquiring corporations. Second, the issuing corporation's stock must be transferred to the acquiring corporation in exchange for property.  Transfers so described in section 304(a)(1) are often referred to as "brother-sister" stock sales; section 304(a)(2) offers analogous rules for "parent-subsidiary" sales.

To guide in evaluating the above two requisites, section 304 and related sections set forth several pertinent definitions.

Regarding the control element, section 304(c)(1) specifies that "control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote, or at least 50 percent of the total value of shares of all classes of stock."  Section 304(c)(3)(A) further clarifies that "Section 318(a) (relating to constructive ownership of stock) shall apply for purposes of determining control under this section".  As a result, indirect ownership through family members and related entities is taken into account in ascertaining control.  See sec. 318(a).  A person who owns at least 5 percent of a corporation's stock, for example, is considered as owning a proportionate amount of any shares held by that corporation.  See sec. 304(c)(3)(B)(i); sec. 318(a)(2)(C).

Property is defined for purposes of sections 301 through 318 as "money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock)."  Sec. 317(a); cf. Bhada v. Commissioner, 89 T.C. 959, 963-964 (1987), affd. 892 F.2d 39 (6th Cir. 1989), affd. sub nom. Caamano v. Commissioner, 879 F.2d 156 (5th Cir. 1989).

Given the foregoing requirements and definitions, we are satisfied that Mr. Combrink's exchange of LINKS stock for debt release is a transaction of the type described in section 304(a)(1).  With respect to control, Mr. Combrink directly owned

100 percent of the stock of both LINKS (the issuing corporation) and COST (the acquiring corporation) immediately prior to the transfer. Furthermore, after the transfer he continued to own 100 percent of COST directly and thereby owned 100 percent of LINKS constructively through application of section 318(a)(2)(C). Consequently, Mr. Combrink at all times held and never relinquished control of both LINKS and COST.

As regards the second element, the exchange of stock for property, Mr. Combrink transferred the LINKS stock to COST and received in return a release from liability. In this connection, regulatory law indicates that a corporation's cancellation of shareholder indebtedness owed to the corporation constitutes property within the meaning of the section 317(a) definition. See sec. 1.301-1(m), Income Tax Regs. Regulations under section 301, which statute relies on the same section 317(a) definition of property, expressly provide that "cancellation of indebtedness of a shareholder by a corporation shall be treated as a distribution of property." Id.

Accordingly, we conclude that release by COST of Mr. Combrink's liability was a distribution of property within the meaning of sections 317(a) and 304. We further observe that our result is the same regardless of whether we characterize the instant transaction as involving assumption, cancellation, or forgiveness of debt. Although petitioners repeatedly emphasize

that the LINKS stock was exchanged for debt assumption rather than forgiveness of Mr. Combrink's liability, the section 304 calculus does not turn on the basis of such labels, at least not in the circumstances of this case.  As a practical matter, there exists no substantive difference between a corporation's canceling versus assuming a debt owed to itself.  We thus treat the terms as synonymous on these facts and equally applicable to the release of Mr. Combrink's liability.

Lastly, we note that whatever particular abuses may have led to the enactment of section 304, we may not judicially create a supposed policy-based exception where a transaction falls within the plain language of the statute as written.  We therefore need not parse whether the December 1996 transfer did or did not effect something akin to a bailout of earnings.  The transaction meets the only two elements set forth in section 304(a) and hence, absent a specific statutory exception, must be recast as a redemption.

## II.  The Exception--Section 304(b)(3)(B)

Section 304(b) provides an exception to the statute's operation.  Although section 304(a) is expressly stated to override section 351 in most cases where both are potentially applicable, see sec. 304(b)(3)(A), section 304(b)(3)(B) authorizes the following limited exception:

(B) Certain assumptions of liability, etc.--

(i) In general.--In the case of an acquisition described in section 351, subsection (a) shall not apply to any liability--

(I) assumed by the acquiring corporation, or

(II) to which the stock is subject,

if such liability was incurred by the transferor to acquire the stock.  For purposes of the preceding sentence, the term "stock" means stock referred to in paragraph (1)(B) or (2)(A) of subsection (a).

(ii) Extension of obligations, etc.--For purposes of clause (i), an extension, renewal, or refinancing of a liability which meets the requirements of clause (i) shall be treated as meeting such requirements.

(iii) Clause (i) does not apply to stock acquired from related person except where complete termination.--Clause (i) shall apply only to stock acquired by the transferor from a person--

(I) none of whose stock is attributable to the transferor under section 318(a) (other than paragraph (4) thereof), or

(II) who satisfies rules similar to the rules of section 302(c)(2) with respect to both the acquiring and the issuing corporations (determined as if such person were a distributee of each such corporation).
* * *

This exception can be restated in terms of four general requirements:  (1) The acquiring corporation must have obtained the transferred stock in a section 351 transaction; (2) the acquiring corporation must have assumed a liability or taken the transferred stock subject to a liability; (3) the transferor

shareholder must have incurred the assumed liability to acquire the transferred stock; and (4) the transferred stock must not have been acquired from a person whose stock was attributable to the shareholder under the section 318 attribution rules.

In the present controversy, respondent challenges only the third of the elements enumerated above. Accordingly, we focus our analysis on whether the $174,133.20 liability released by COST was incurred by Mr. Combrink to acquire the LINKS stock. Petitioners bear the burden of proving that this question should be answered in the affirmative. See Rule 142(a).

Of the $174,133.20 assumed by COST, the stipulated evidence explicitly establishes only that $72,263.38 was transferred to or used for the benefit of LINKS. Remittances on August 31 and December 20, 1995, of $15,729.17 and $11,228.64, respectively, were applied to repay creditors for services and property related to the LINKS business. Then, in 1996, payments totaling $45,305.57 were made directly to LINKS. However, the parties also agreed that all nine accounts receivable transactions, including those on May 26 and December 29, 1995, were consistently treated as loans from COST to Mr. Combrink, followed by loans from him to LINKS. On the basis of such consistency, we

are willing to assume that $89,728.73 was applied for the benefit of LINKS. Conversely, the record fails to trace the remaining $84,404.47 canceled to any use benefiting LINKS.

Furthermore, the evidence shows that the amounts supplied by Mr. Combrink to LINKS, both through COST and from personal sources, were initially characterized as debt, not equity. Mr. Combrink owned 100 percent of the outstanding LINKS stock prior to any such remittances and did not at the time of these loans to LINKS receive any additional shares or equity. Only subsequently was $175,000.00 of the $252,481.03 once represented by promissory notes from LINKS to Mr. Combrink redesignated as additional paid-in capital. Although we are willing in these circumstances to accept this recapitalization as establishing that $175,000.00 was used to acquire LINKS stock within the meaning of section 304(b)(3)(B)(i), $77,481.03 still remained outstanding in the form of debt. Since the $89,728.73 portion of the assumed liability that can be traced to LINKS exceeds this $77,481.03 that clearly was intended to represent debt rather than equity in LINKS by only $12,247.70, we are able to determine from the record only that $12,247.70 of the $174,133.20 assumed by COST was used to acquire stock or equity in LINKS.

As to this $12,247.70 amount, we hold that petitioners are entitled to the section 304(b)(3)(B) exception. With respect to the remaining $161,885.50, petitioners have failed to carry their

burden of proof on a required element of the section 304(b)(3)(B)
exception.  We therefore hold that, to the extent of $161,885.50,
the disputed December 1996 transaction is not removed from the
purview of section 304(a) by reason of section 304(b)(3)(B).

III.  The Tax Treatment--Sections 301 and 302

The $12,247.70 exempted from section 304(a) results in no
gain or loss under sections 351 and 357, and we need not address
it further.  However, because we have decided that $161,885.50 of
the transaction must be recast as a redemption in accordance with
section 304(a), we turn now to the tax consequences of that
characterization.  Section 302 provides the framework governing
tax treatment of redemptions and reads in pertinent part as
follows:

SEC. 302.  DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) General Rule.--If a corporation redeems its
stock (within the meaning of section 317(b)), and if
paragraph (1), (2), (3), or (4) of subsection (b)
applies, such redemption shall be treated as a
distribution in part or full payment in exchange for
the stock.

(b) Redemptions Treated as Exchanges.--

(1) Redemptions not equivalent to dividends.--
Subsection (a) shall apply if the redemption is not
essentially equivalent to a dividend.

(2) Substantially disproportionate redemption
of stock.--

      (A) In General.--Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.

      (B) Limitation.--This paragraph shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote.

      (C) Definitions.--For purposes of this paragraph, the distribution is substantially disproportionate if--

         (i) the ratio which the voting stock of the corporation owned by the shareholder immediately after the redemption bears to all of the voting stock of the corporation at such time,

is less than 80 percent of--

         (ii) the ratio which the voting stock of the corporation owned by the shareholder immediately before the redemption bears to all of the voting stock of the corporation at such time.
         * * *

(3) Termination of shareholder's interest.--Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

(4) Redemption from noncorporate shareholder in partial liquidation.--Subsection (a) shall apply to a distribution if such distribution is--

      (A) in redemption of stock held by a shareholder who is not a corporation, and
      (B) in partial liquidation of the distributing corporation.

    *    *    *    *    *    *    *

(c) Constructive Ownership of Stock.--

> (1) In general.--Except as provided in paragraph (2) of this subsection, section 318(a) shall apply in determining the ownership of stock for purposes of this section.
>
> * * * * * * *
>
> (d) Redemptions Treated as Distributions of Property.--Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.

Thus, under the schematic created in section 302, unless a redemption transaction falls into one of four enumerated categories qualifying for treatment as a sale or exchange, it is taxed in accordance with section 301. When evaluating whether a transfer takes one of the four listed forms in the context of a section 304 proceeding, section 304(b)(1) directs that such determination be made by reference to the stock of the issuing corporation.

Here, we conclude that the December 1996 transaction is not among the four types afforded exchange treatment. First, pursuant to United States v. Davis, 397 U.S. 301, 313 (1970), the transfer cannot qualify as "not essentially equivalent to a dividend" under section 302(b)(1). The U.S. Supreme Court ruled in United States v. Davis, supra at 307, 313, that redemption of the shares of a corporation's sole stockholder is "always" essentially equivalent to a dividend and, consequently, that a taxpayer "who (after application of the attribution rules) was

the sole shareholder of the corporation both before and after the redemption" could not meet the section 302(b)(1) test.  Since section 318(a) deems Mr. Combrink the sole stockholder of LINKS, the issuing corporation, both prior to and following the transfer, he likewise is entitled to no relief under paragraph (1).

Second, the attribution rules similarly prevent the subject transaction for qualifying for sale treatment under section 302(b)(2).  As a result of constructive ownership, the transfer failed to effect the requisite change in Mr. Combrink's voting control which would signal a substantially disproportionate redemption.

Third, an identical rationale, namely, no reduction in deemed ownership, precludes the redemption from constituting a complete termination of Mr. Combrink's interest under section 302(b)(3).

Lastly, with respect to section 302(b)(4), the facts contain no indication that LINKS or COST was involved in a plan of partial termination.  We therefore conclude that the December 1996 transaction is governed by section 302(d) and, accordingly, that the tax effects thereof must be determined under section 301.

Section 301 provides in relevant part:

SEC. 301.  DISTRIBUTIONS OF PROPERTY.

(a) In General.--Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

(b) Amount Distributed.--

(1) General rule.--For purposes of this section, the amount of any distribution shall be the amount of money received, plus the fair market value of the other property received.

* * * * * * *

(c) Amount Taxable.--In the case of a distribution to which subsection (a) applies--

(1) Amount constituting dividend.--That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

(2) Amount applied against basis.--That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock.

(3) Amount in excess of basis.--

(A) In general.--Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property. * * *

Section 316(a), in turn, defines "dividend" as "any distribution of property made by a corporation to its shareholders--(1) out of its earning and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year". In other words, a section 301 distribution is taxed as a dividend, and therefore as ordinary income, to the extent of the distributing corporation's earnings and profits. Only after such earnings and profits are exhausted may the distribution be treated as a return of basis or capital gain.

Additionally, for purposes of applying the above test to a section 304 redemption, section 304(b)(2) specifies that the amount of the dividend shall be determined as if the property were distributed first by the acquiring corporation to the extent of its earnings and profits and then by the issuing corporation to the extent of its earnings and profits.

As previously indicated, the cancellation of a liability is considered the equivalent of a distribution of money in the face amount of the obligation. See sec. 1.301-1(m), Income Tax Regs. Yet on the record before us, petitioners, who bear the burden of proof, have introduced no evidence to show that COST lacked earnings and profits in at least the amount of the debt release

afforded to Mr. Combrink.  We thus are constrained to hold that petitioners received dividend income in the amount of $161,885.50 in 1996, pursuant to sections 301, 302, and 304.

To reflect the foregoing,

Decision will be entered

under Rule 155.